IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JESSICA LYNN MUND,

      Plaintiff,

vs.                                                        No. CIV 10-542 LFG

MICHAEL J. ASTRUE,
Commissioner,
Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiff Jessica Lynn Mund's ("Mund") Motion to Reverse and Remand for a Rehearing, filed October 19, 2010.  [Doc. 16.]  The Commissioner of Social Security issued a final decision denying benefits, finding that Mund was not disabled and not entitled to supplemental security income ("SSI") benefits or disability insurance benefits ("DIB"). The Commissioner filed a response to Mund's Motion [Doc. 17], and Mund filed a reply [Doc. 18]. Having considered the pleadings submitted by the parties, the administrative record ("AR") and the applicable law, the Court grants Mund's motion and remands this case for additional administrative proceedings.

## I.     PROCEDURAL RECORD

On February 9, 2007, Mund applied for SSI and DIB [AR 97, 101], initially alleging she was disabled since January 9, 2007, [AR 13, 148] due to "bipolar/borderline personality, hole in heart." [AR 148.]  Mund also asserted she had concentration problems, tremors in her hands, manipulative

limitations in her hand after hand surgery, heart problems, and depression.  [AR 27, 33, 97, 101, 148, 297, 399, 400.]

At the administrative law judge hearing ("ALJ hearing"), Mund amended her date of onset to January 1, 2008, because she had earned more than $12,000 during 2007. [AR 13, 38-39.] Mund's SSI and DIB applications were denied at the initial and reconsideration levels. [AR 47, 48, 49, 50, 51, 58.]   On December 5, 2008, the ALJ conducted an administrative hearing in Albuquerque, New Mexico, at which Mund was represented by counsel.  [AR 21.]

On March 26, 2009, the ALJ issued a decision finding Mund not disabled. [AR 13-19.] Thereafter, Mund filed a timely request for review.  On May 14, 2010, the Appeals Council, after considering additional evidence, denied Mund's request for review and upheld the final decision of the ALJ.  [AR 1.]  On June 3, 2010, Mund filed a Complaint for court review of the ALJ's decision. [Doc. 1.]

Mund was born on November 12, 1987 [AR 97] and was 21 years old at the time of the ALJ hearing.  [AR 24.] She dropped out of 11th grade but subsequently obtained a G.E.D. [AR 24, 153.] She testified at the ALJ hearing that she had barely finished one year of college. [AR 24.]

Mund has held a number of short-lived jobs. [AR 103-110, 136, 139.]   She worked as a cashier, sales clerk, restaurant hostess, and babysitter or nanny. [AR 196, 344.]  Her longest held job perhaps lasted one year and eight months at different Petco locations. [AR 149, 196.] Jobs ended because she had difficulties with concentration and getting along with co-workers and managers. [AR 27, 28, 136, 239, 315, 325-26.]  Mund has a minimal earnings history. [AR 103-110.]

Mund is single and has had a number of boyfriends.  She appears unable to sustain relationships for any significant period of time. [AR 301, 318, 330, 332, 334, 350, 352.],   Most

often, she lived at home with her parents. [AR 98.] Mund has been diagnosed with and treated for

mental health or behavioral issues since the age of 5 or 6. [AR 385.]

## II.   STANDARDS FOR DETERMINING DISABILITY

In determining disability, the Commissioner applies a five-step sequential evaluation

process.[1]  The burden rests upon the claimant to prove disability throughout the first four steps of

this process, and if the claimant is successful in sustaining her burden at each step, the burden then

shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines

that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in

substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that

it "significantly limits her physical or mental ability to do basic work activities . . . .;"[4] at step three,

the Commissioner must conclude the claimant is disabled if she proves that these impairments meet

or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App.

1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the

physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of

the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[1]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3]20 C.F.R. § 404.1520(b) (1999).

[4]20 C.F.R. § 404.1520(c) (1999).

[5]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

At step five, the ALJ can find that the claimant met her burden of proof in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997).  For example, expert vocational testimony might be used to demonstrate that the claimant can perform other jobs in the economy. Id. at 669-670.  If, at step five of the process, the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

In this case, the ALJ determined at step four that Mund retained the RFC for work at all exertional levels, with nonexertional limitations: Mund could interact with the general public, but should not have extensive contact with coworkers or supervisors.  She could maintain attention and concentration with normal breaks during the workday.  [AR 18.]  The ALJ further determined that this RFC did not preclude Mund from performing her prior relevant work as a retail cashier as that job is actually and generally performed. [AR 20.]

## III.   STANDARD OF REVIEW

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards.  Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more

---

[7]One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy.  Those categories are: sedentary, light, medium, heavy and very heavy.  20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

than a mere scintilla, but it need not be a preponderance.  Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003); Langley, 373 F.3d at 1118; Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004).  The Court's review of the Commissioner's determination is limited.  Hamilton v. Sec'y of HHS, 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court may not substitute its own judgment for the fact finder, nor re-weigh the evidence.  Langley, 373 F.3d at 1118; Hamlin, 365 F.3d at 1214; Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).  Grounds for reversal also exist if the agency fails to apply the correct legal standards or to demonstrate reliance on the correct legal standards. Hamlin, 365 F.3d at 1114.

It is of no import whether the Court believes that a claimant is or is not disabled.  Rather, the Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Hamilton, 961 F.2d at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.

After "careful consideration of all the evidence" [AR 13], the ALJ denied Mund's request for SSI and DIB. [AR 13-20.] The ALJ found that Mund had not been engaged in substantial gainful activity since the amended onset date of January 1, 2008.  [AR 15.]  The ALJ also found that Mund

5

had severe impairments of a "personality disorder, not otherwise specified and a mood disorder." [AR 15.] The ALJ determined that Mund had several non-severe impairments: "patent foramen ovale" ("PFO") and attention deficit disorder ("ADD"). The ALJ made no findings with respect to alleged depression or to manipulative limitations in the hand. [AR 16-17.] Mund did not have an impairment or combination of impairments that met or medically equaled a listing. [AR 17.]

After a review of the entire record, the ALJ made the RFC finding described above. The ALJ also concluded that Mund's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC determination. [AR 19.] While a VE was present at the hearing, the ALJ did not elicit any vocational expert testimony.

## IV.   MEDICAL HISTORY AND BACKGROUND

Mund's medical history is well-documented, beginning as far back as July 1994, when she was just 6 years old.[10] In 1994, Mund was given a neurologic evaluation for behavioral difficulties observed since early childhood. She exhibited impulse control problems with low frustration tolerance, behavioral outbursts, screaming, banging, and daily leg kicking. She was explosive, aggressive, unpredictable, and demanding, as well as expressive and affectionate. There were previous findings, even at this early date, of hyperactivity and ADD. She was treated with Ritalin but the side effects made her too lethargic. Mund's mother, an attorney, also had a history of problems with impulse control as a child and a diagnosis of depression. [AR 385.] Mund's EEG at this time was normal for her age. [AR 384.]

---

[10]There are older medical records that were made part of this administrative record, but they are not relevant to the claims.

The next pertinent medical record is from 2002, when Mund was about 14 years old. She

had a past medical history of depression, and was taking Zyprexa[11] and Effexor.[12] [AR 388.] In 2003,

at age 15, Mund was taking Lithium,[13] Zyprexa, Wellbutrin,[14] and Topamax.[15] [AR 378.]

### *2004*

The majority of Mund's psychiatric and counseling records begin in 2004, when Mund was

16 years old. During 2004, Robert Townsend, a Ph.D counselor, saw Mund approximately 16 times.

Mund's mother attended a number of the sessions with Mund. [AR 274-76.] Townsend observed

some bipolar tendencies in Mund's mother who acknowledged she, too, had been diagnosed with

bipolar disorder. [AR 285.] The notes reflect that Mund exhibited angry outbursts and had kicked

a hole in a door. [AR 278.] Townsend concluded Mund had diagnoses of bipolar disorder with

---

[11]Zyprexa "is used to treat certain mental/mood conditions (such as schizophrenia, bipolar mania). It may also be used in combination with other medication to treat depression."  www.webmd.com

[12]Effexor or Venlafaxine is an antidepressant (serotonin-norepinephrine reuptake inhibitor type-SNRI) used in the treatment of depression and anxiety.  www.webmd.com

[13]"Lithium is used to treat and prevent episodes of mania (frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Lithium is in a class of medications called antimanic agents. It works by decreasing abnormal activity in the brain." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000531

[14]Bupropion (Aplenzin, Wellbutrin, Wellbutrin SR, Wellbutrin XL) is used to treat depression. http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000970

[15]Topamax or "Topiramate is used alone or with other medications to treat certain types of seizures in people who have epilepsy. Topiramate is also used with other medications to control seizures in people who have Lennox-Gastaut syndrome (a disorder that causes seizures and developmental delays). Topiramate is used to treat patients who continue to have seizures even when they take other anti-seizure medications. Topiramate is also used to prevent migraine headaches, but not to relieve the pain of migraine headaches when they occur. Topiramate is in a class of medications called anticonvulsants. It works by decreasing abnormal excitement in the brain." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000998

mixed psychotic features, depressive disorder, and anxiety disorder.  Mund was taking Lithium, Synthroid (for low thyroid),[16] Zyprexa, Topamax and Wellbutrin.

In late 2004, Mund's mother consulted with treating psychiatrist Lisa Feierman, who subsequently began to treat Mund.  Dr. Feierman's records are detailed but often undated.  Mund saw Feierman off and on from November 2004 through part of 2008. [AR 307-369.]  Feierman initially noted Mund's family history of depression, ADHD (attention deficit hyperactivity disorder), and possible bipolar II.  Mund's past diagnosis was bipolar-mixed state.  Mund's mother described Mund as intelligent and kind but that at age 17, she had "many years of a degree of social difficulty including over-interpreting relationships, thinking people are negative or against her when they aren't, rapid and unpredictable mood swings and anger." [AR 363.] Mund had been in special education classes since the second grade because she was not able to get along with the other kids. [AR 361, 367.]

According to the patient information form, filled out by Mund's mother, Mund suffered from bipolar disorder and anxiety since she was 8 years old.  Mund had "very low self esteem, some exaggerated feelings of ability, obsessive thoughts, extreme mood swings, inconsistent sleep and appetite and effort/ability to concentrate." [AR 365.]  She had been medicated with Wellbutrin since she was 11, and Lithium from age 15.  Mund started Symbyax[17] when she was 16. [AR 365.]

---

[16]Hypothyroidism is a side effect of taking Lithium. [AR 364, 365.]

[17]"Symbyax (fluoxetine and olanzapine) contains a combination of fluoxetine and olanzapine. Fluoxetine is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Olanzapine is an antipsychotic medication. These drugs affect chemicals in the brain.  Symbyax is used to treat depression caused by bipolar disorder (manic depression). Symbyax is also used to treat depression after at least 2 other medications have been tried without successful treatment of symptoms." http://www.drugs.com/symbyax.html

As of November 2004, when Mund was 17 years old, she had run away from home and was living with her boyfriend.  Her mother believed she was flunking out of 11th grade and was considering whether it might be best to allow Mund to live with the boyfriend at this time, with conditions.  [AR 364.]

Feierman's notes indicate that at age 8 or 9, Mund's school became concerned with her ability to socialize with peers and noted her tendency to easily be "set off." [AR 360.] Mund was increasingly difficult when "she thought should be getting better."  It is not clear whether these are Mund's or her mother's reports to Feierman.  At age 10, Mund was seen by the Chief of Psychiatry in Miami where she was diagnosed as "rapid cycling bipolar." [AR 360.] Prozac (anti-depressant) was prescribed but it made Mund "bounce off the ceiling."  At age 11, Wellbutrin was added, as was Zyprexa, which made a "huge difference."  Later, Seroquel[18] was added to the regimen but it did not help.  Klonopin[19] made Mund feel "drugged out."  She took Depakote[20] in 2002 for about two years.

---

[18]Seroquel or "Quetiapine tablets . . . are used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions). Quetiapine tablets . . . are also used alone or with other medications to treat or prevent episodes of mania (frenzied, abnormally excited or irritated mood) or depression in patients with bipolar disorder (manic depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Quetiapine extended-release tablets are also used along with other medications to treat depression. Quetiapine tablets may be used as part of a treatment program to treat bipolar disorder and schizophrenia in children."  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001030

[19]Klonopin or "Clonazepam is used alone or in combination with other medications to control certain types of seizures. It is also used to relieve panic attacks (sudden, unexpected attacks of extreme fear and worry about these attacks). Clonazepam is in a class of medications called benzodiazepines. It works by decreasing abnormal electrical activity in the brain." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635

[20]Depakote or "Valproic acid is used alone or with other medications to treat certain types of seizures. Valproic acid is also used to treat mania (episodes of frenzied, abnormally excited mood) in people with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). It is also used to prevent migraine headaches, but not to relieve headaches that have already begun. Valproic acid is in a class of medications called anticonvulsants. It works by increasing the amount of a certain natural substance in the brain." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000677

At some point, Mund argued with her teacher and threatened to kill herself.  Mund was not hospitalized for inpatient treatment, but she attended a mental health day program one day a week.

### *2005*

As best as the Court can determine from Feierman's undated records,[21] Mund saw the treating psychiatrist 14-15 times in 2005.  Mund was not taking all medications as prescribed in early 2005, and tended to forget them at times.  She was more irritable without the medications, but she wanted to stop taking Lithium because of the tremors.  Depakote resulted in her crying and feeling aggressive.  Almost all of the psychiatric treatment and medical records indicate that Mund did not use alcohol or drugs. [AR 347, 355.] Many of the psychiatric records discuss Mund's various short lived relationships with boyfriends. [*See, e.g.,* AR 348, 352, 355.]  On January 10, 2005, Feierman prescribed Prozac (anti-depressant). [AR 354.]

Feierman observed that Mund's tendency was to see things as "all or none," or "black and white."  She was irritable and edgy, but Feierman did not observe symptoms of mania, *e.g.,* racing thoughts or decreased sleep.  Mund's biggest conflict at this time was with her parents, although on occasion, she got along well with her family.  [AR 352, 353.] Mund tended to get along better in life and with her family if her current relationship with a boyfriend was going well.  Feierman suspected that Mund's reactivity and "all or none reactions to life and relationships" were suggestive of a strong Axis II component, meaning a personality disorder as opposed to bipolar disorder. [AR 352.]

Mund wanted to stop taking Lithium due to the side effect of shakiness.  She was easily agitated and had broken up with a boyfriend. [AR 350.] She felt her mood swings contributed to the

---

[21]The Court attempts to summarize Feierman's undated records in order, but is not certain of the chronology since most records have no dates, some have a month and a day without a year, and a very few have a full date.

problems.  She was fighting with her father "nonstop, mom too."  Feierman's assessment was continued lability, mostly irritable, crying, and anger.  Prozac might be worsening these symptoms. [AR 350.]

During the next session with Feierman, Mund stated she "just wanted to be stable." [AR 348.] She cried five times the day before "for nothing."  She had "blown off" a boyfriend for weeks. She was depressed, although her mother said her behavior and attitude were much better.  She was often feeling sad but not suicidal.  She was not shaking as much after reducing her dose of Lithium, but her depression had increased.  Feierman believed that the discontinuation of Prozac had reduced Mund's irritability and reactivity.  It was not clear if her depression was due to the change in medications, adjusting to a new "OCP (oral contraceptive)" or just would have happened.  [AR 348.]

On the next visit with Feierman, Mund was more depressed, irritable, and angry.  Her father had been yelling at her.  Mund was interviewing for a babysitting job.  Feierman noted that the side effects of Propranolol can increase depression, but that even on a therapeutic dose of Lithium, Mund still had problems.  Mund was attempting to get a job and her GED at this time.  Feierman believed, overall, there was improvement with continued intermittent impulsivity (anger).  She observed "borderline traits," rather than bipolar symptoms. [AR 347.]

Mund reported to Feierman that she had a babysitting job for three children 2-4 days a week. She was getting along better with her boyfriend and family, was more active, and seemed to be improving with the reduction of medications.  Feierman continued to observe borderline traits with a mood disorder. [AR 344.]

Mund again reported that she was more stable after she discontinued Lithium.  She had fewer mood swings and less anger.  Her boyfriend commented Mund had not had a bad day in two weeks. Feierman discussed Mund's tendency to "catastrophize" and her low self esteem.  Feierman found

11

that Mund was more stable off of Lithium and Prozac.  But, she noted that Mund was happy in her current relationship which could be a contributing factor.  Feierman still believed that Mund had borderline personality traits. [AR 343.]

On the next visit, Mund reported a decreased tolerance level, but she had missed some doses of Wellbutrin and noticed the difference.  Her depression was not as bad as it had been.  Her home situation was very stressful, but she was relatively stable, considering her stress. [AR 342.]

Mund contacted Feierman by telephone to complain she was not sleeping well since she started a new thyroid medication.  She felt no tolerance or patience, and was angry and irritable.  She had fought with her parents.  All medications were continued but Topamax was increased. [AR 341.]

Mund's anger improved after taking more Topamax, but her depression was worse and she was crying more.  Her boyfriend felt Mund called him too much and was too "clingy."  She was still arguing with her parents, who were pressuring her to find work and obtain her GED.  She slept longer hours.  Feierman believed Mund had a personality disorder, that the symptoms had been present the entire time she had seen Mund, and that they were brought out most by relationships conflicts.  Feierman increased the dosage of Wellbutrin. [AR 340.]

On November 22, 2005, Mund reported to Feierman that she was babysitting on the weekends.  Her depression was fine although she broke up with her boyfriend.  She had another friend who wanted to date her.  She felt good, her anger was "fine," relations with her parents were better, and she was working on getting her GED.  Mund did not drink or use drugs.  Her mood was "pretty good." [AR 339.]

On December 5, 2005, Feierman noted that Mund had missed an appointment due to lack of finances, but that this message contradicted a previous message that Mund missed the appointment due to oversleeping.  Feierman would not change medications over the telephone and

12

stated she had not seen Mund for 7 months. [AR 338.] However, it appears Feierman saw her in late November.  [AR 339.]

Feierman saw Mund on December 23, 2005.  Mund reported interpersonal struggles. Feierman noted there was little improvement based on what she had seen, even with Mund taking a higher dose of medications.  Feierman agreed to gradually decrease some of the medications.  She had not observed symptoms of bipolar disorder and assessed Mund with Borderline Personality Disorder.  Mund was taking Wellbutrin and Zyprexa, but not Topamax.  She asked Mund to read some books on Borderline Personality.  If Mund's symptoms did not worsen, Feierman planned to decrease Zyprexa. [AR 336-37.]

### *2006*

Mund reported fighting with her father.  She was getting along well with her current boyfriend and had signed up for classes at TVI.  She thought the classes were too easy but she could not change them due to a poor reading score.  Feierman wrote, "Can you tell Topamax is stopped? Moody."  Mund felt she was less stressed since not taking Topamax.  She was working at Wendy's 30-40 hours a week.  She discussed a lower dose of Zyprexa.  Feierman observed no evidence of bipolar disorder but continued to believe Mund had Borderline Personality Disorder.  She would chart her moods and perhaps reduce Zyprexa. [AR 334, 335.]

In perhaps February 2006, Mund was "on a break" from her current boyfriend, but still felt pretty good.  She wanted to stop taking Zyprexa.  Feierman discussed that Mund tended to do well when her relationship was going well versus "independent cycling bipolar moods."  Mund was "doing great" on this occasion, and Feierman reduced the Zyprexa prescription. [AR 332.]

Less than a month later, however, Feierman received a telephone call informing her that Mund was in the ER overnight, after not having eaten enough for three days and becoming

dehydrated.  She was rehydrated and released.  Mund was in a "tailspin" over the possible breakup with her boyfriend.  Feierman spoke to Mund who had been crying for two days and could not stop. Mund was sad, angry, and could not fall asleep.  She was labile and fearful in the ER.  Mund was not handling the stress of her relationship and was driving by her boyfriend's house and following him.  She denied stalking him and said she just wanted reassurance from him.  Mund did not want to try Zyprexa again because of the weight gain.  Mund denied any suicidal ideation.  A strength of Mund's was that she did not abuse drugs.  She was referred to group therapy but was uncomfortable with the thought of group sessions.  She was given a prescription for Seroquel.  Feierman still believed the diagnosis was Borderline Personality Disorder, but this had been the longest stretch of time Mund had not been on any mood stabilizer.  The timing of the relationship problems made it difficult to reach a diagnosis. [AR 330, 331.]

On March 9, 2006, Mund saw Dr. Easter, who noted a history of bipolar illness and a diagnosis of possible Borderline Personality Disorder.  Mund had been depressed.  Her psychiatrist had discontinued prescriptions of Topamax ad Zyprexa.  Mund had done well for a few day but was now more depressed and not eating well.  She had gone to Kaseman Behavioral the day before when she was hospitalized overnight.  She was convinced, and Dr. Easter agreed, that she should re-start Zyprexa.  Mund reported taking Zyprexa since age 13 and that it had always worked well.  Dr. Easter's assessment was depression.  Mund was to contact her psychiatrist the next day. [AR 228.]

Mund had cried only one time since starting Seroquel.  She was continuing with Wellbutrin, Seroquel, and Ambien. [AR 328, 329.]

On March 20, 2006, Mund saw Susan Flynn, Ph.D. at the Family Workshop.  The intake assessment indicated a diagnosis of bipolar disorder since age 7.  Mund had a possible diagnosis of Borderline Personality Disorder as well.  Feierman had suggested therapy and that she work on

14

issues.  Mund had difficulties calming herself and talked a lot.  She had tried many medications and now took Wellbutrin and Seroquel.  Most of the examination results were normal but Flynn rated Mund's ability to concentrate as "failed." [AR 297.] She was assessed with a GAF of 80.  Mund was working full time at a fast food restaurant then.  Flynn observed that Mund, at 18 years old, was very knowledgeable about medications.  She intended to explore the possible diagnosis of Borderline Personality Disorder. [AR 297-99.]

On May 4, 2006, Mund saw Dr. Easter for nausea, vomiting, and diarrhea.  He asked Mund's mother to take her to the ER for IV fluid therapy as there was significant volume depletion. [AR 227.] There are no corresponding hospital records in the administrative record.

On May 8, 2006, Mund again saw Dr. Easter who said the work-up at the hospital was negative.  Mund felt anxious at times, and Dr. Easter's assessment was probable anxiety.  She was not anemic.  Mund was advised to consult with Feierman regarding medications for possible anxiety and control of bipolar symptoms. [AR 226.]

There are notes from Feierman, dated May 18, indicating Mund was to continue Wellbutrin.  She was also prescribed Temazepam or Restoril (for sleep problems).  Mund was to talk to Susan Flynn about relationship issues with managers and co-workers. [AR 327.]

An undated note from Feierman, probably near this time frame, states Mund is doing well with her boyfriend but is "pissed off" or "depressed the whole time at work." [AR 326.] She was getting angry very easily and it was worse after starting Seroquel.  She did not like one of her co-workers and gritted her teeth around him.  When asked what he had done, she said he was "just happy all the time."  Feierman discussed a job change rather than a change of medications.  Feierman discussed Borderline Personality Disorder with Mund, interpersonal relationship difficulties, and the need to work on this now.  Feierman commented that she did not want to use

15

medications when the trigger seemed to be situational.  Feierman still not observe symptoms of mania.  Mund had been more irritable and angry than this in the past when she was on four medications.  Feierman believed she was reacting to stress and that possibly Wellbutrin was causing sleep problems. [AR 326.]

During another session, Mund reported to Feierman that her mother thought she was "manic" every day.  She had occasional increases in anger.  She needed Ambien to sleep and felt tired, with reduced energy.  Mund was irritable before, during, and after taking Seroquel.  Feierman thought work was a big part of her stress level.  A co-worker told Mund that the manager hated her and Mund reported she did not know why they did not like her.  She did not get along with managers and was thinking of quitting.  It appears from this record that Mund was seeing therapist, Susan Flynn regularly, and yet there are few therapy records that are part of the administrative record. Feierman commented that Mund was short in her payments by about $25 or $28.  She had been short by $20 more than 15 times.  It seems that Mund was paying for her own treatment sessions with Feierman. [AR 325.] Feierman continued to prescribe Wellbutrin and added Abilify.[22]  She asked that Mund check on "in network" psychiatrists so she could schedule regular appointments, apparently because Mund was having difficulty paying for appointments with Feierman. [AR 324.]

---

[22]Abilify or "Aripiprazole is used to treat the symptoms of schizophrenia (a mental illness that causes disturbed or unusual thinking, loss of interest in life, and strong or inappropriate emotions) in adults and teenagers 13 years of age and older. It is also used alone or with other medications to treat episodes of mania or mixed episodes (symptoms of mania and depression that happen together) in adults, teenagers, and children 10 years of age and older with bipolar disorder (manic-depressive disorder; a disease that causes episodes of depression, episodes of mania, and other abnormal moods). Aripiprazole is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone. Aripiprazole is in a class of medications called atypical antipsychotics." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000221

At the next appointment, Mund told Feierman that her life was "screwed up."  She was unemployed, depressed, angry, tense, and felt "weird inside."  She slammed a loose door and it fell off.  She felt badly because she had no privacy.  Her brother was really irritating her, and she was fighting a lot with her parents.  She had started seeing the therapist again, but there are few or no therapists' records in the administrative record.  Mund's mother believed that her increased irritability was mania.  Mund's shaking was better.  She denied suicidal ideation, substance abuse, or self harm. [AR 323.]

On one disability form, Mund noted that she had been employed with Petco since July 2006, but that her hours were reduced in January 2007.  She worked between 20-25 hours per week as of January 9, 2007. [AR 113.]

On August 25, 2006, Mund saw Dr. Rogers for persistent fatigue, light headedness, and temperature intolerance.  She wondered if she was anemic.  Dr. Easter had checked her blood count and thyroid studies in May 2006, which were normal.  Dr. Rogers informed Mund it was highly unlikely that she had developed a condition in such a short time.  He noted bipolar and anxiety problems.  [AR 224.]

On September 27, 2006, Mund saw Dr. Hall.  Mund had fallen and was suffering bilateral ankle pain.  She was thin looking and uncomfortable, but there was no fracture.  She worked a 5-hour shift.  The doctor thought she would not be comfortable on her feet for the entire shift and gave her a note to this effect. [AR 222.]

*2007*

Feierman addressed a letter, dated January 7, 2007, to whom it may concern.  The letter stated Mund was under Feierman's care and on medication for a condition that can cause anxiety

that could require her to leave work early.  "However, this should not limit her ability to work most of the time." [AR 321.]

January 9, 2007 was the original onset date of disability [AR 13, 113], although Mund amended the date to January 2008 during the ALJ hearing.

A disability services form, dated January 9, 2007, stated Mund started working at Petco in July 2006 and that her hours were reduced on January 2007.  This note indicates Mund stopped working within six months because of her medical condition or because her hours were reduced. [AR 113.]

Feierman filled out a prescription on January 17, 2007, for Ambien, Abilify, and Wellbutrin. [AR 320.] On that same date, Mund reported she had just gotten a job hostessing at the Outback restaurant.  She thought dropping out of school was a mistake because she needed to work to pay for her car and insurance.  She was living with roommates at this time but thinking of moving out. She felt left out when her roommates went out at night.  Mund drank "every couple weeks - not much."  She had broken up with her boyfriend.  Mund did not like the new manager at Petco.  She had been required to clean all the cash registers the week before by the end of her shift, and the manager was angry when she did not finish.  Petco had reduced her hours several weeks earlier and she had been stressed because of her finances.  This week, her hours were increased from 18 to 24/week.  Mund reported that Abilify had helped her not overreact.  She was not depressed. Feierman noted Mund's increased independence and the fact that she was working; however, she had work conflicts.  The "main worsening still tends to be reactive to stressors." [AR 319.]

On January 26, 2007, Mund saw Dr. John Baca.  Mund was 19 years old at this time and described as "very pleasant."  She had suffered from dyspnea, lack of energy, and shortness of breath for several years but had not mentioned her shortness of breath to anyone.  She lacked energy

18

and was chronically tired.  She felt pressure in her upper sternal region if she took a deep breath.

Her thyroid tests were normal.  She had a history of bipolar disorder that was "apparently under

decent control" with Abilify and Wellbutrin.  The doctor wished to rule out primary cardiovascular

disorders. [AR 216.] Chest x-rays were mostly normal. [AR 235.]

On January 30, 2007, Mund had an echocardiogram that revealed "patent foramen ovale,"[23]

which Mund refers to as a hole in her heart. [AR 206.] On February 5, 2007, Mund was seen at the

New Mexico Heart Institute by Dr. Frankis.  Mund's list of medications were: Wellbutrin, Ambien,

Abilify, and birth control.  She reported a history of fatigue and shortness of breath for years, along

with chest pressure for 3-4 years.  While Dr. Frankis noted the finding of PFO, the remainder of the

echo was normal.  Mund worked full time. [AR 203.] She was fatigued, anxious, and depressed. [AR

204.] Dr. Frankis discussed the condition of PFO with Mund and her mother, stating that there was

no data, under circumstances where Mund had not suffered a cerebral event, to suggest that specific

therapy was required.  Dr. Frankis did not feel the findings were related to shortness of breath or

fatigue since Mund's oxygen saturation was normal.  Mund planned to obtain opinions from two

other cardiologists, although it is not clear that she did. [AR 202-04.]

On February 9, 2007, Mund applied for SSI and DIB. [AR 97, 101.]

---

[23]"A patent foramen ovale (PFO) is a defect in the septum (wall) between the two upper (atrial) chambers of the heart. Specifically, the defect is an incomplete closure of the atrial septum that results in the creation of a flap or a valve-like opening in the atrial septal wall (see illustration). A PFO is present in everyone before birth but seals shut in about 80% of people."  "Although present in about one in five adults, PFOs usually cause no symptoms at all. Far less than 1% has a stroke or other outcome that results in the need to have the PFO closed." http://my.clevelandclinic.org/disorders/patent_foramen_ ovale_pfo/hic_patent_foramen_ovale_pfo.aspx

On February 15, 2007, Mund had another echocardiogram ordered by Dr. Frankis.  She had fair exercise capacity for her age.  The findings were normal and there was no evidence of ischemia. [AR 200-01.]

There is a disability report, dated March 16, 2007, indicating Mund was still working at this time. [AR 122.] On March 28, 2007, Mund's mother filled out a third-party function report. [AR 128.] Mund lived with her mother.  She was fairly active and engaged in "most normal life activities," like eating, dressing, and bathing.  When she worked, Mund prepared for work and drove to her part-time job.  If she was not working, Mund slept well into the afternoon at times. [AR 135.] Mund had irregular sleep habits and sometimes did not go to bed until 5-7 a.m.  She ate infrequently and irregularly, and did not socialize.  She took care of the family pets if pressured. [AR 129.] Mund had never been able to function cooperatively in the family or with friends. [AR 129.] She was often tired and stressed.  Mund was "obsessive" about what she wore, and the slightest imperfection "sent her off." [AR 129.]  It could take her hours to dress because of her obsessiveness with appearance. She was meticulous with her hair, and her shaving had to be perfect every day.  Mund had tremors in her hands.  She neglected nutritional and sleep needs and required verbal reminders. [AR 130.] She did not prepare or eat full meals on most days; she tended to eat once a day.  Mund's mother said Mund had not changed much since the age of 7. [AR 130.]

Mund could do chores when pressed, but other than laundry, Mund did nothing in the household.  If her parents requested help, they were met with volatile and explosive episodes. [AR 130.] Mund was too overwhelmed by every day activities to do anything.  She had no savings and paid her bills but usually incurred late fees.  She refused input from her parents.  Her primary interests were therapeutic horseback riding and dancing in her room.  She rarely went anywhere with others.  She could not walk far.  She could not pay attention, was easily confused, and continually

20

asked for help understanding what to do.  Mund could not follow complex instructions and did not accept instructions well from authority figures.  She was distrustful and tended to "go off" or become "unglued."  She could not handle stress.  She cried, trembled, worried obsessively, and complained. [AR 133-34.] Mund was not flexible or adaptive.  She was extremely secretive and suspicious.  She had extreme moods with very few moderate or stable moments.  She was overly "hyper;" she talked and moved constantly, or was reclusive or upset.  Mund was not amenable to humor, correction, or instruction.  Normally, she was combative and argumentative.  She stormed away and slammed doors when angry.  "Living with her results in stress, confrontation and exasperation every day.  She is absolutely unable to maintain stable, long term relationships with family or acquaintances."  On the other hand, Mund could be pleasant and polite for short periods. [AR 135.]

Mund's mother stated Mund could remember minute details about very obscure and insignificant events but could not, for example, recall the President's name.  She tended to forget very basic information and did not understand abstract ideas.  She had very poor concentration. Mund had three part-time jobs in the past two years but was compelled to leave each job because of conflicts and difficulty in interpersonal work relationships.  She could not accept criticism and was not able to work through even the slightest difficulties with co-workers or supervisors. [AR 135-36.]

Mund submitted a work history to disability services, dated March 30, 2007, in which she stated she had worked for two months as a cashier at a fast food restaurant in 2005; six months as a cashier at a fast food restaurant in 2005 and 2006; two months as a hostess; and approximately eight months as a cashier at a retail pet store. [AR 139, 140.]

In an undated disability report, Mund stated that she could not work because of "bipolar/borderline personality, hole in heart," [AR 148] but it appears she still was working at Petco at this time. She stated she had difficulties concentrating, got upset easily, cried a lot, and wanted to go home. Mund stated that she was working as a cashier at a retail pet store from 2005 to the present (early 2007). [AR 149.]

In a function report, dated April 2, 2007, Mund was living with her parents. She got up in the morning, dressed and drove to work, if she was working. If not, she stayed at home, visited her grandparents, visited horses, and called her grandmother in Florida every day. She had tremors and was not able to use her hands for small things, like buttons and shoelaces. She sometimes remained awake all night. [AR 159, 160.] She tended to go without eating, and her eating habits varied with her moods. She could do the laundry and load the dishwasher but needed to be reminded or pushed to help. [AR 161.] She was able to get out every day and could shop. [AR 162.] She was unable to keep track of her finances. She wrote: "I have been the same since age 10." [AR 163.] She fought with her family and did not have friends. She talked too much and very fast. She had left almost every job she had because of personality issues or conflict. She quit school and left home for the same reasons. [AR 164, 165.] Stress made her lose control.

On April 21, 2007, Dr. Paula Hughson conducted a psychiatric evaluation of Mund, who was 19 years old then and living with her parents. [AR 239.] Mund was unemployed and stated she had worked in a few fast food and retail jobs, the longest job lasting 8 months which she quit in March 2007 because "she could not get along." She last attended school at CNM in May 2006 when she finished a spring semester. Dr. Hughson found Mund made very good effort during the evaluation and considered it, therefore, a valid assessment of her cognitive and emotional state.

22

Mund's chief complaint was that she could not get a job and could not get along with people very well.  When she was depressed, she took it out on others.  At her last job, she had outbursts in front of customers.  Mund described her history as having had mood instability "her entire life."  At age 5, she was diagnosed with ADD, and at age 7, with Bipolar Disorder.  She had seen mental health providers regularly, more or less, and had been on psychotropic medications since an early age.  Mund reported that Feierman believed she had Borderline Personality Disorder.  Mund moved with her family to Florida in October 2003 while in 10th grade and did poorly after the move.  She barely passed 10th grade, dropped out, and later obtained a GED in October 2004.  She began seeing Feierman in 2004 and had visits every 3 months initially but had not seen her in 6 months due to lack of funds.  She worked weekly with a therapist for 8 months of the last year and felt better but had to discontinue therapy because of lack of finances and "longstanding stubbornness about feeling independent" and believing she could manage on her own.  Mund had been paying out of pocket for all medical and mental health services since 2004.  She described her activities as spending most of the time in her room, often on the computer, looking at courses she might take "and things, I could never achieve." [AR 239-40.]

Mund could not concentrate enough to read books which is why she dropped out of school.  She had no energy and had to force herself to initiate almost anything.  Some days, it was difficult to get out of bed.  She went without showering for days and ate poorly.  She was extremely irritable with a labile mood if not on medications.  Mund constantly cried and became angry.  She had trouble tolerating frustration and was quick to take things wrong.  She engaged in loud verbal outbursts, door banging, and storming out.  There was significant tension at home, along with bickering and criticism.  She moved into an apartment with two others when she had a job last year but did not get along well after awhile and had to return home.  She stated the situation between her

and her father sometimes escalated into violence at times.  Her father struck her ten months ago, and she called the police.

Mund reported she did not use drugs and drank very little.  A significant amount of the history described to Dr. Hughson is consistent with other records.  Dr. Hughson observed that Mund was well informed, cooperative, and did not seem to magnify symptoms.  Her mood was dysphoric and labile.  She showed good judgment and her insight was better than average. [AR 242.]  She seemed entirely capable of managing her own funds as she was responsible for paying her medical and incidental expenses for several years.

Dr. Hughson noted that Mund's attention and concentration were good "for the purposes of the interview" [AR 242] but that she could be expected to have moderate difficulty understanding and remembering basic instructions in a work setting and significant problems concentrating and persisting at tasks of basic work and especially getting along with others. [AR 242.]

> She is an intelligent and perspicacious young woman who has apparently suffered from mood instability since childhood.  There may be a genetic predisposition, judging from her description of her father's anger problems.  On the other hand, it seems likely that she would have been repeatedly traumatized emotionally in an apparently quite dysfunctional family with high levels of negative expressed emotion, where she took on something of a "scapegoat" role.  She is very affected by her chronic and very negative view of herself. . . . She will continue to require expert mental health care indefinitely.

[AR 242-43.] Dr. Hughson provided the following diagnoses: Mood Disorder, NOS, R/O Bipolar Disorder, Possible Attention Deficit Disorder, Obsessive Compulsive Disorder.  She deferred reaching a diagnosis at Axis II (developmental and personality disorders).  Mund had severe psychosocial stressors, high levels of expressed emotion in the family, some history of physical abuse, difficulty with access to appropriate mental health care, educational, vocational deficits.  Dr. Hughson assessed her GAF as 55 "Serious Symptoms and Serious Impairment." [AR 243.]

On May 29, 2007, Dr. Chiang performed a mental RFC assessment. [AR 245.] She found Mund had no "marked" limitations but that she was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, and maintain attention and concentration for extended periods. [AR 245.] Mund was not significantly limited in her ability to work in coordination with others but had moderate limitations in her ability to interact appropriately with the general public, accept instructions and criticism from supervisors, and get along with coworkers or peers. She was moderately limited in her ability to respond appropriately to changes in the work setting. [AR 245-46.] On the last page of the Mental RFC Assessment, Dr. Chiang wrote in quotes: "Claimant can understand, remember, and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors, and respond appropriately to changes in a routine work setting." [AR 247.] It is not clear whether these are Dr. Chiang's conclusions which appear to conflict with other findings she made in this assessment or if she was quoting from some other form/evaluation.

On the Psychiatric Review Technique form, also completed by Dr. Chiang on May 29, 2007, she found moderate limitations in Mund's abilities to maintain social functioning and to maintain concentration, persistence, or pace. [AR 249, 259.]

On May 29, 2007, Mund's applications for benefits were denied at the initial level. [AR 47, 48, 51.]

On June 28, 2007, Dr. Greer of the Family Workshop, saw Mund, who apparently was living in Florida at this time. [AR 304.] The record notes that Mund was living with her grandmother while her parents were living in New Mexico. Mund reported she was "bipolar" and that all symptoms were constant. She admitted to impulsivity, distractibility and constant fatigue. Dr. Greer marked ADHD as being present. There was a family history of depression on her mother's side and perhaps

25

ADHD on her father's side.  Mund was having headaches and barely ate.  "Lithium" is noted on the record but it is not clear if Mund was taking Lithium again.  Dr. Greer noted that Mund was irritable, depressed and crying.  Her affect was flat.  She was taking Ambien for sleep problems. [AR 304.]

Mund also reported to Dr. Greer that she could not keep a job, had "flipped out," and continued to quit jobs. [AR 305.] She claimed to have major learning problems even though she had been an honors student in elementary school.  She was diagnosed with ADHD at age 5 and Bipolar Disorder at age 7.  She had taken Wellbutrin, Zyprexa, Topamax, Seroquel, Ritalin, Paxil, and Prozac.  She was now taking Abilify and Wellbutrin.  She drank a lot of energy drinks that kept her awake. [AR 305.] Dr. Greer was adding Adderall[24] to her medications and attempting to taper the Abilify.  He wished to consider Topamax and Lamictal. [AR 306.]

On August 1, 2007, Mund saw Dr. Greer again.  She was taking Abilify, Wellbutrin, and Adderall. [AR 303.] The record indicates Lithium did "fine" for several years.  Mund was irritable, easily distracted, and had low energy.

There are several undated disability reports for Mund's appeal, that were prepared with the help of a legal assistant of Mund's counsel. [AR 171, 184.] One report states that Mund's symptoms were worse.  She was always thinking of negative outcomes, and was depressed, less rational and very impulsive. [AR 171.] She had severe borderline personality and clinical depression.  The worsening of symptoms occurred in May 2007. [AR 172.] She took leave from her job for 60 days due to an "emotional melt down."  At another point, she stated she had abandoned her employment

---

[24]Adderall is "[t]he combination of dextroamphetamine and amphetamine [that] is used as part of a treatment program to control symptoms of attention deficit hyperactivity disorder (ADHD; more difficulty focusing, controlling actions, and remaining still or quiet than other people who are the same age) in adults and children."  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000166

for 60 days.  She noted that she was born with two right thumbs and that one was surgically removed when she was born. [AR 176.]

The disability report states that Mund felt more stress, irritability, anxiety, depression and negativity, that worsened in August 2007. [AR 184.] She had seen Dr. Greer in Boca Raton.  She was clinically depressed with severe mood swings.  Mund did not remember to shower and did not always groom herself unless reminded. [AR 188-89.]

On August 21, 2007, Mund saw a therapist at the Family Workshop in Florida.  Her affect and mood were described as irritable.  She was frustrated and lethargic.  Seroquel made her tired. She had thrown her telephone and that of her grandmother's, banged doors, and thrown her purse. She stated the best medications in the past were Lithium and Zyprexa, both of which resulted in weight gains, and Topamax.  Adderall helped her concentrate but made her anger worse.  She was working as a sales associate at a pet store and wanted to be a canine instructor.  She hoped to be a "live-in" nanny but needed to stabilize her anger problems first.  At this point, Mund was 19 years old and had been with her boyfriend for seven months.  She was getting along with her co-workers. She never felt hungry, but denied binging or purging.  The plan was to increase the Abilify and hold off on the Adderall until her mood stabilized.  Seroquel was to be discontinued.  They were going to give Mund a trial of Topamax and discontinue the Wellbutrin.  But, after Mund's mother spoke to the therapist on the telephone, she asked that they wait to see if the Abilify and Topamax helped Mund before stopping Wellbutrin. [AR 301.]

On September 4, 2007, Mund's request for reconsideration was denied. [AR 49, 50, 58.]

On September 5, 2007, there is a note from the Family Workshop indicating Mund believed the larger dose of Abilify was making her more irritable.  She preferred a lower dose.

On September 26, 2007, Mund filed a request for an ALJ hearing. [AR 64.]

27

### *2008*

On January 16, 2008, Mund saw Dr. Easter in Albuquerque.  He noted that Mund had been living in Florida for one year but had returned.  She was currently taking Abilify, Topamax, Ambien, and Wellbutrin.  She was attempting to re-establish with a therapist.  She was a baby sitter for a Lovelace doctor, who had observed Mund was short of breath.  Mund denied chest pressure but stated she was evaluated at the heart hospital in about 2006 and was found to have a PFO.  Her dyspnea on exertion was thought to be a component of anxiety.  Mund was referred to a pulmonary specialist for an evaluation. [AR 488.]

On January 23, 2008, Mund saw Feierman again.  She was taking Abilify, Wellbutrin, Ambien, and was to decrease the Topamax to see if she was clearer and less tired on a lower dose.  Mund was irritable, impatient, and tired.  She had not yelled at her parents yet.  She was drinking energy drinks.  She did not want to add medications to address side effects of other medications.  Mund reported she was worked at Petco a lot and had a babysitting job.  She was one of several nannies for a young boy with a brain tumor.  Mund was tired all of the time and had no patience.  Topamax and Adderall were added in Florida.  Both made her "go crazy."  Mund wanted to move out of her parents' house again because she thought she was too old to live at home.  [AR 315-17.]

On January 29, 2008, Mund saw Dr. Barkoff after she slipped on some ice and sprained her wrist.  He wrote a work excuse that Mund should avoid heavy lifting and cash register use for three weeks.  [AR 496.]

On March 5, 2008, Mund saw Dr. Baca for problems with urinary frequency, nausea and a stomach upset.  She was having unprotected sex with a boyfriend. [AR 485.

On March 12, 2008, she again saw Feierman who changed her medications since Mund was forgetting to take or skipping some of the medications anyway.  She was to continue the Wellbutrin

until she ran out.  She was to take Topamax and Abilify.  Feierman could adjust the medications more depending on the symptoms.  [AR 313-14.] She felt dizzy and anxious.  This is one of the few notes indicating Mund had been drinking and had had drinks on two of the last weekends.  She continued to have mood swings and interpersonal struggles.  [AR 314-15.]

On March 27, 2008, Dr. Easter saw Mund, who had been in the ER two nights before with bilateral lower abdominal pain.  She was given Vicodin and an IV of morphine.  She had a history of chronic constipation. [AR 434.]

Mund saw Feierman on April 17, 2008, who told her she needed to take all of her medications or none at all.  Taking them on and off was worse. [AR 312.]

On May 3, 2008, Feierman changed the medications or dosages.  Mund was to take Abilify, continue with Wellbutrin and Topamax, and take Ambien as needed.  Feierman was trying to find a dose of Ability that would stabilize Mund and then wished to decrease the Topamax, which might be affecting her concentration and motivation.  Feierman discussed lowering her fee if Mund was paying herself.  Mund was trying to take her medications daily but skipped them sometimes because she "spaced out too much."  She wanted to feel more energetic and motivated.  She was moving into a new roommate situation. [AR 311.]

On October 31, 2008, Mund saw psychiatrist Kenneth Bull in Albuquerque.  Dr. Bull's mostly illegible notes state that Mund was unemployed since July 2008.  They also indicate "ADD" and "OCD."  The rest of the notations are difficult to decipher. [AR 370-72.]

On November 3, 2008, Feierman wrote a letter to someone on behalf of Mund related to a request for housing assistance.  Feierman stated she had been treating Mund off and on since November 24, 2004.  She understood that the present letter had been requested to try to help Mund qualify for assisted housing.  Feierman agreed Mund was applying for social security disability due

to a combination of factors/psychiatric conditions and that she has been unable to hold a job and support herself consistently the entire time Mund had been seeing Feierman.  Mund did better when she took her medications and was regularly seen for her psychiatric conditions.  According to Feierman, Mund had no issues with drug or alcohol.  Due to a recent assault, Mund would be more comfortable with a one-bedroom apartment so that she could lock the bedroom door at night. Feierman wrote that Mund's conditions are "likely lifelong, and should continue as a handicap for well past the next 12 months."  Feierman's note indicated she was a double board certified psychiatrist in child and adolescent psychiatry as well as general adult psychiatry. [AR 374.]

There is an undated work background form, noting that Mund worked as a sales clerk at Dan's Boots and Saddles in Albuquerque for about a month in late 2008.  She worked for the Democratic Party of New Mexico for one day in 2008.  She worked at three pet stores in Albuquerque for short periods.  She had worked at three Petco shops for about a year and eight months, "off and on." [AR 196.]

The ALJ held a  hearing on December 5, 2008. [AR 21.] Mund was 21 years old.  Her testimony reads as if she was unfocused, and she testified that she could not concentrate. [AR 27.] She further testified that she had 3-4 jobs in the last year and perhaps 6-7 this year.  "[I]t's just increasing like crazy and the job links have shortened and I'm just –" [AR 28.] When asked about her longest job at Petco and whether she worked a solid one year and eight months, she testified:

> Well, two month break because I went to Florida and decided I was, I went to Florida for two weeks and decided I was going to, it was a two week vacation and decided I was going to just not go back home because I liked Florida better and that was me being unstable.  And then I called my work and made up a lie to get me on like a probation, on like a temporary leave and they didn't fire me and then I got transferred in two months to Florida.  And then in Florida, I was not financially able to keep myself there.  I tried so hard just to stay there.  And I wasn't able to support myself so I moved back here in,

in like January.  I was there like eight months or so and I transferred back here but there was no time difference between that.  It was just a straight transfer.

[AR 28-29.] Her position at Petco ended because she "could not stand" the managers, who were really hard on her. [AR 29.] She described quitting other prior jobs because she could not get along with co-workers. [AR 29-31.] She worked only 15 days at Dan's Boots and Saddles, also because of conflict at work. [AR 32.] She later testified that her jobs at Dan's and the Democratic Party ended because of her bipolar symptoms. [AR 35.]

Mund testified she took Topamax for her bipolar condition and depression.  She had been feeling a lot of depression and crying often.  She had mood swings on and off, but mostly felt depressed. [AR 32-33.]

As of December 2008, Mund testified that she was seeing a new psychiatrist, Dr. Bull and a therapist in his office on a weekly basis. [AR 39.] During the ALJ hearing, the ALJ asked Mund very few questions.

### *2009*

In March 2009, Mund saw an orthopedist about additional surgery on her thumb.  The surgery took place on March 19, 2009, and there were no complications.  [AR 400, 404, 406.]

On March 26, 2009, the ALJ issued a decision denying Mund's application for SSI and DIB. [AR 13-19.]

On March 30, 2009, Mund began experiences problems from the thumb surgery.  She complained of severe pain and went to the ER. [AR 412, 415, 418.] On April 3, 2009, the orthopedist saw Mund and noted the incisions were healing well.  Mund, however, felt her thumb was crooked.  The physician wondered if she had psychological issues affecting her judgment.  She became upset and said she had bipolar disease. [AR 397-98.]

31

On April 24, 2009, x-rays of the thumb showed good alignment and Mund was to begin therapy to improve functioning of her thumb. [AR 396.]

On May 19, 2009, Mund filed a request for review of the ALJ's decision, and the Appeals Council denied the request on May 14, 2010. [AR 1, 6.]

## V.   DISCUSSION

### A.   Alleged Legal Error

Mund asserts that the ALJ erred in finding she could return to her past work.   More specifically, Mund contends that the ALJ erred at each of the three phases of the RFC evaluation. [Doc. 16, p. 3.] Mund also argues that the ALJ's credibility findings were erroneous. [Doc. 16, p. 13.]

### B.   Step Four Findings

RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.   S.S.R. 96-8p, 1996 WL 374184, *1 (July 2, 1996).   In the present case, the ALJ was required to consider all factors that affect Mund's ability to perform the tasks involved in wage-earning activities.

The RFC assessment at step four of the sequential evaluation is comprised of three phases. Parise v. Astrue, 2010 WL 4846097, *2 (10th Cir. Nov. 30, 2010) (unpublished).

> In the first phase, the ALJ must evaluate a claimant's physical and mental . . . (RFC), and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work. In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one.   At each of these phases, the ALJ must make specific findings.

Id. (citing Winfrey v. Chater, 92 F.3d 1017, 1023 (10th Cir. 1996)).   With respect to phase one, the ALJ must consider all of the claimant's impairments, including impairments that are not severe.   See

32

*id.* (*citing* 20 C.F.R. §§ 404.1545, 416.945, and <u>Wilson v. Astrue</u>, 602 F.3d 1136, 1140 (10th Cir.

2010)).

> While a "not severe" impairment(s) standing alone may not
> significantly limit an individual's ability to do basic work activities,
> it may–when considered with limitations or restrictions due to other
> impairments–be critical to the outcome of a claim.

S.S.R. 96-8p, 1996 WL 374184, *5 (July 2, 1996).

> In assessing RFC, the adjudicator must discuss the individual's
> ability to perform sustained work activities in an ordinary work
> setting on a regular and continuing basis (i.e., 8 hours a day, for 5
> days a week, or an equivalent work schedule), and describe the
> maximum amount of each work-related activity the individual can
> perform based on the evidence available in the case record.

<u>Id.</u>, *7.

The limitations identified in the "paragraph B" and "paragraph C" criteria on the Psychiatric

Review Technique forms are used to rate the severity of mental impairments at steps 2 and 3.  <u>Id.</u>,

*4.  "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires

a more detailed assessment by itemizing various functions contained in the broad categories found

in paragraphs B and C of the adult mental disorders listings. . . ."  <u>Pryce-Dawes v. Barnhart</u>, 166 F.

App'x 348, 351 (10th Cir. Feb. 2, 2006) (unpublished) (citation omitted).

In his written decision, the ALJ selected and emphasized the very few notations in the

administrative record that might tend to support his RFC finding that Mund could perform a full

range of work at all exertional levels (with some nonexertional limitations) and his finding that

Mund lacked credibility.  *See, e.g.*, <u>Hierstein v. Chater</u>, 110 F.3d 73 (Table, Text in Westlaw), 1997

WL 158177, at *2 (10th Cir. Apr. 2, 1997) ("[T]he ALJ's choice of two superficially favorable

notations out of a five-year treatment record, downplaying the severity of a chronic mental

impairment inherently varying with the vicissitudes of the patient's life, reflects the kind of

33

misleading selective inquiry courts have decried on numerous occasions.") (unpublished).  Here, for

example, the ALJ focused on the treating psychiatrist's records indicating Mund exhibited no mania

during sessions and that reactivity to work stressors, financial difficulties, and relationship break-ups

triggered her symptoms.[25]

In contrast to these limited notations, the administrative record is well documented with

Mund's serious and continuing mental health diagnoses, including hyperactivity and ADD from age

6, depression from age 14 [AR 388], bipolar disorder "mixed with psychotic features," depressive

disorder, suicidal threats at age 15 [AR 366], bipolar and anxiety disorder at age 16 [AR 274-75,

296, 364 385], bipolar and possible borderline personality disorder, mood disorder, mood disorder

with borderline traits at age 17 [AR 340, 343, 344, 350, 356], depression, anxiety, history of bipolar

illness, and borderline personality disorder at age 18 [AR 224, 226, 228, 230, 297, 323, 324, 326,

330, 334], and bipolar disorder, mood disorder, possible ADD, and OCD at ages 19-20  [AR 216,

243].

Mund was described, at the age of 6 and younger, as having impulse control problems with

low frustration tolerance, behavior outbursts, screaming, banging, daily leg kicking, explosiveness,

aggression, and unpredictable moods. [AR 385.] At ages 8-9, Mund's school became concerned with

her difficulties in socializing with peers and the fact that mund was easily "set off."  [AR 360.]

At age 16, she was described as having sleep and appetite problems, fatigue, and difficulties

with concentration, self esteem, sadness, worry, and anger. [AR 369.] Mund, at age 16, was also

described as having had **many years** of a degree of social difficulty including over interpreting

---

[25]A number of the pages cited to by the ALJ in his decision do not appear to correspond to
supporting records from the administrative record.  For example, the ALJ cited to pages 8, 14, 21, and 28
of Dr. Feierman's records to support discussion of what triggered Mund's symptoms, yet most of those
records were prescriptions for medications. [AR 15.]

relationships, thinking people felt negatively towards her, rapid and unpredictable mood swings, and anger. [AR 362.] She had kicked a hole in a door in anger. [AR 278.]  From grades 2 through 10, Mund was in special education classes; she dropped out of high school in grade 11. [AR 361, 367.]

At age 17, Mund continued to exhibit similar symptoms, *e.g.,* anger, irritability, crying, aggression, impatience, fighting with her family, continued lability, sadness, mood swings, and interpersonal/relationship problems.  She stalked a boyfriend, talked incessantly, and was very defensive.  [AR 336, 340, 341, 342, 343, 344, 347, 348, 349, 350, 353, 355, 358.]

At age 18, Mund was described as moody and tired, angry, sad and crying during a visit to the ER when she had not eaten enough for three days, expressing increased irritability and mood swings, "failed" concentration, more depressed, anxious, and fatigued, increased interpersonal difficulties with managers and coworkers, and feeling "tense and weird inside." [AR 226, 228, 297, 326, 323, 330, 334.]

At ages 19-20, Mund was described as sufficiently anxious that she might have to leave work early, having work conflicts, lacking energy, feeling chronic tiredness, and expressing volatility and explosiveness. [AR 130, 216, 318, 321.] She had trouble getting along with people and maintaining employment. [AR 239.] She took out her anger and frustration on people and had emotional outbursts at work. The consulting psychiatrist determined that Mund would require expert mental health care indefinitely when she examined Mund at age 19. [AR 243.]

At age 21, Mund was observed by an orthopedist specialist as having psychological issues that were affecting her judgment about the results of recent surgery on her thumb. [AR 397.]

While there are a few treatment notes in the administrative record documenting improvement in Mund's symptoms or "good days," the vast majority of the many records clearly document Mund's ongoing serious mental health problems and diagnoses.  In addition, since about age 6,

Mund was prescribed sleep medications, antidepressants, and psychotropic medications.  For example, she took Ritalin at about age 6 but it made her lethargic. [AR 385.]  Throughout her young life, *i.e.,* from ages 6-21, Mund was prescribed varying dosages of Restoril, Ambien, Lithium, Zyprexa, Wellbutrin, Topamax, Effexor, Synthroid (related to a side effect from taking Lithium), Symbyax, Seroquel, Klonopin, Prozac, Inderal, Depakote, Abilify, Lamictal , Paxil, and Adderall. [AR 184, 202, 213, 216, 239, 240, 296, 301, 303, 304, 305, 306, 311, 314, 316, 317, 319, 320, 321, 323, 324, 326, 327, 328, 330, 332, 334, 336, 348, 349, 355, 358, 360, 364, 365, 378, 388, 488.] It is a rare medical record that does not indicate Mund is taking two to three medications for her mental health conditions.

However, the ALJ made only passing reference to Mund's prescription medications.  "The claimant has been prescribed psychotropic medications Abilify, Wellbutrin, Topamax, Ambien, Zyprexa, Cymbalta and others." [AR 15.] This statement understates the medications Mund was prescribed and continued to take from ages 6-21.

The ALJ noted that Mund had been in counseling with a therapist but that very few therapy records were part of the administrative record. [AR 16.] This is true to some extent.  For example, there are very few records from therapist Susan Flynn.  However, there are reams of psychiatric treatment notes from Dr. Feierman who saw Mund from late 2004 through part of 2008.  At times, Dr. Feierman saw Mund regularly and as often as 16 times in one year, *e.g.,* in 2005.  In addition, there are records from social worker/counsel Robert Townsend during 2004, indicating he had seen Mund many times that year as well. [AR 274-296.]

The ALJ also noted records where Mund was non-compliant with her medications [AR 16], but the majority of medical records indicate she was compliant, suffered a number of serious side effects from medications (*e.g.,* tremors from Lithium, "bouncing off ceiling" from Prozac, "drugged

36

out" from Klonopin, "horrible crazy" feelings from Depakote), and was having her medications continually adjusted in an attempt to improve her condition and symptoms. [*See, e.g.,* AR 216 (Abilify and Wellbutrin controlling bipolar symptoms decently), 239 (discussing history of medications), 296, 297 (restarting Zyprexa), 318 (thinks Abilify is helping), 327 (trying Restoril instead of Ambien), 326 (Wellbutrin may contribute to sleep problems), 330 (thinks Zyprexa has not been helpful), 334 (Topamax stopped but is moodier; maybe decrease Zyprexa), 342 (noticed difference if missed dose of Wellbutrin), 343 (more stable off Lithium and Prozac), 347 (Propranolol can increase depression), 348 (less Lithium may decrease tremors; other side effects discussed), 350 (Prozac may increase agitation), 355, 358, 360, 362 ("long use medical compliance on her own," even at age 16 or 17), 364, 365, 378].   Comments in the medical record about Mund's non-compliance are few compared to her apparent compliance with medications.  Mund's occasional non-compliance may be explained by her forgetfulness or financial difficulties, which are not discussed by the ALJ.  [*See, e.g.,* AR 239-40, (paying out of pocket for all medical and mental health expenses since 2004), 310 (discuss lower cost if paying for self), 311 (trying to take medications daily, may space out sometimes), 312, 313, 317, 326 (paying for own psychiatric treatment).]

In addition, the ALJ commented that the records demonstrated Mund was "drinking two or three times a week," citing pages 7, 8, and 9 of Dr. Feierman's notes. [AR 16.]  Pages 8 and 9 [AR 314, 315] do not refer to drinking. Page 7, however, states: "Has been drinking.  Drank last wknd-3 Smirnoff Ice @ friend's house.  Wknd before buzzed.  No other drugs." [AR 313.] The ALJ did not mention the psychiatric notes at p. 12 [AR 318] indicating Mund reported she had been drinking "every couple of weeks - not much."  In addition, there is one additional record that states Mund had had 3 drinks "2-3x/wk" but none in the past. [AR 310 (p. 4).] The ALJ's reference to Mund's drinking conflicts with other records noting that one thing Mund had in her favor was that she did

not abuse drugs or alcohol.  [AR 240-41 (does not use drugs, very little alcohol), 330-31, 339, 347, 374).]

In addition, while the ALJ emphasized that in January 2008, Mund was working two jobs and had lived independently with a roommate [AR 16], this does not depict Mund's ordinary situation.[26]  Typically, Mund was unable to live independently for long and moved back in with her troubled family. [AR 240 (did not get along with roommates), 311 (too much drama, moving into new roommate situation), 315-17 (had been living with grandmother; wants to move out of parents' house again), and 318 (living with roommates but may move out).]

Mund testified that the longest held job was for 18 months at Petco.  However, it is not clear from the record that she worked for 18 months straight.  Rather, it is more likely that Mund worked at three different Petco locations with some gaps of time between those jobs. [AR 196 (worked at Dan's Boots and Saddles for 15 days; worked at three different pet store locations, each for 2 weeks; worked at three Petco shops for 1 year and 8 months "off and on", worked for Democratic Party for one day), 113 (worked for Petco from July 2006 to January 2007 and stopped working within six months), 228 (has part time job), 136 (has had three part time jobs in past two years; compelled to leave each job because of conflict and difficulties with interpersonal relationships at work), 165 (left almost every job had because of personality issues or conflict), 239 (had outbursts at work in front of customers), 325 (does not know why they do not like her at work).]

_____

[26]The ALJ also noted that the "claimant has lived on her own," and that Mund babysat for a young child with special needs.  She has had "several boyfriends." [AR 17.] The ALJ's discussion is correct but incomplete.  Evidence in the administrative record indicates Mund lived on her own only a few times and for short lengths of time, that the babysitting job was part time and did not last long, and that she had many, many short-lived relationships with boyfriends.

The ALJ minimized Mund's numerous mental health diagnoses, consistent treatment and medications for serious mental health conditions, and frequently troubled employment and family life; the ALJ also discounted Mund's evaluations by her examining psychiatrist (Feierman) and the consulting psychiatrist (Hughson). [AR 16 and 19.] For example, the ALJ determined that Dr. Hughson's findings of significant limitations in concentration and in social interaction were inconsistent with her own report and that nothing in the interview "would seem to support [Hughson's] finding, except for the claimant's own reporting." [AR 19.] Thus, the ALJ gave Hughson's opinions "little weight."

Dr. Hughson, at the request of disability services, provided a detailed report of her examination of Mund on May 21, 2007. [AR 239.] Hughson noted that Mund made very good effort during this evaluation and that Dr. Hughson considered it a valid assessment of her cognitive and emotional state. [AR 239.] Mund did not seem to magnify symptoms. [AR 242.] Mund described her history of school (did horrible, dropped out, obtained GED), family life (chaotic, great deal of tension, bickering and criticism, singled out as problem child), and mental health problems and treatment, which all appeared consistent with other records in the administrative record.

Based on the history, evaluation, and medical records reviewed, Dr. Hughson concluded that Mund could be expected to have moderate difficulty understanding and remembering basic work instructions in a work setting and significant difficulties concentrating and persisting at tasks of basic work and getting along with others. [AR 242.] Dr. Hughson also found that Mund's attention and concentration were "good for purposes of conducting the interview." [AR 242.] She concluded that Mund would require expert mental health care indefinitely and had diagnoses of a mood disorder, bipolar disorder, possible ADD, and OCD. There were severe psychosocial stressors.

39

Mund was assessed with a GAF of 55, after which Dr. Hughson wrote "serious symptoms and serious impairment." [AR 243.][27]

Dr. Hughson's report is supported by the record and should have been granted more weight, or alternatively, the ALJ should have demonstrated the limitations noted by Dr. Hughson that were inconsistent "with her own report."  Thus, it appears that the ALJ erred in discounting the report or in failing to adequately explain why the report was not supported by the evidence.

The ALJ similarly discounted Dr. Feierman's opinion [AR 19], explaining that Feierman did not set forth any specific limitations in a note, dated November 3, 2008. [AR 374.] Dr. Feierman's note to a housing official stated, in part, that Mund has been unable to hold a job and support herself consistently due to a combination of factors/psychiatric conditions. [AR 374.] "Her conditions are likely lifelong, and should continue as a handicap for well past the next 12 months."  While this note did not relate to employment and instead, sought to assist Mund in obtaining low-income housing, Dr. Feierman's statements are supported by about 60+ pages of notes and perhaps more than 20 psychiatric treatment sessions. [AR 301-69.]

The ALJ correctly acknowledged that Feierman's opinion should ordinarily be granted great weight but nevertheless discounted it because Feierman set out no specific limitations, and because her November 2008 note was inconsistent with her treatment notes. [AR 19.] However, the ALJ did not state why the note was inconsistent with Feierman's treatment notes, which chronicle years of mental health diagnoses, conditions, and ongoing symptoms.  It appears that the ALJ erred in

---

[27]While true that a GAF of 55 indicates "[m]oderate symptoms ... OR moderate difficulties in social, occupational, or school functioning . . . .," Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. Text Revision 2000) ( DSM-IV-TR ), Dr. Hughson's finding of significant limitations is consistent with her evaluation and the administrative record.  To the extent that the ALJ found inconsistencies in this portion of Dr. Hughson's report, he should have re-contacted the consulting physician for clarification.

granting insufficient weight to the treating physician's opinions or, alternatively, that the ALJ failed to explain why Dr. Feierman's opinions were not supported by the evidence.

In concluding that the RFC was supported by the record as a whole, the ALJ stated that Mund "has improvement in her symptoms when taking medications as directed and has responded well to treatment. . . . Additionally, the claimant has been able to work two part-time works, totaling more than 40 hours a week for several months at a time." [AR 20.] For the reasons described above, there is little evidence in the administrative record to support findings that Mund's condition improved when taking medications as directed and that she responded well to treatment. To the contrary, her medications were constantly being adjusted in an attempt to ameliorate her many serious and problematic symptoms. The fact that she was able to work two part time jobs for more than 40 hours, during one limited period, is only part of the picture. The larger aspect is that Mund rarely, if ever, held a job for more than a few months due to personality conflicts at work, interpersonal problems, inability to get along, and other mental health issues.

Therefore, the Court concludes that substantial evidence does not support the RFC findings. In addition, the Court finds minimal support for the conclusion that Mund is able to interact with the general public. [AR 20.] The records demonstrate, as discussed in detail above, the contrary – Mund consistently had trouble with interactions at work, difficulty with co-workers and customers, and significant problems outside of work. Even the reviewing psychiatrist, upon whom the ALJ primarily relies, found that Mund was moderately limited in her ability to interact appropriately with the general public. [AR 246.] Mund had trouble interacting with other children as early as age 6, and these problems have continued throughout her young life.

Moreover, the ALJ's limitation that Mund "should not have extensive contact with coworkers or supervisors" appears inconsistent with his conclusion that Mund could perform as past

relevant work as a cashier.  There was no testimony or development of the record with respect to the mental demands of the past relevant work, or how much contact Mund was required to have with coworkers and supervisors in her position of cashier.

      The Court also concludes that there is no substantial evidence to support the ALJ's finding that Mund had only "moderate limitations" in maintaining attention and concentration" at work. There was conflicting evidence in the record as to Mund's ability to concentrate and maintain attention.  Dr. Hughson opined that Mund would have significant difficulties concentrating and persisting at tasks of basic work. [AR 242.] Dr. Chiang, who only reviewed records, opined that Mund had moderate limitations in maintaining attention and concentration. [AR 245, 259.] On the same form, Dr. Chiang also wrote that Mund could "attend and concentrate for two hours at a time." [AR 247.] It is not clear whether there is a conflict within Dr. Chiang's testimony and whether there is also a conflict between the ALJ's conclusion that Mund had moderate limitations in attention and concentration "but is able to perform her duties with normal breaks," and Dr. Chiang's limitation that Mund could not attend or concentrate for more than two hours at a time.  On remand, the ALJ must reconcile any conflicts in the testimony and record evidence as to Mund's ability to maintain attention and concentration.

      If the ALJ again reaches step four of the sequential evaluation, he should make specific findings as to all three phases of step four.  *See* <u>Parise</u>, 2010 WL 4846097, *2 (describing three phases).  He must consider all of Mund's impairments, including those that are not severe, *e.g.,* any hand limitations she may have had from her hand surgery.  Further, in assessing the RFC, the ALJ must discuss Mund's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.  SSR 96-8p.

Because the Court remands based on the lack of substantial evidence supporting the RFC findings and for the reasons discussed above, the ALJ is directed to reassess Mund's credibility which is intertwined with the RFC findings.  "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v Chater, 68 F.3d 387, 391 (10th Cir. 1995) (internal citations and quotations omitted).

**VI.** **CONCLUSION**

The Court concludes that Mund's motion is granted and that this matter is remanded for additional administrative proceedings as described herein.

SO ORDERED.

_____
Lorenzo F. Garcia
United States Magistrate Judge